ORIGINAL

15 MAG 3655

Approved: _____
MAX NICHOLAS/MATTHEW LAROCHE
Assistant United States Attorneys

Before:   THE HONORABLE HENRY PITMAN
          United States Magistrate Judge
          Southern District of New York

U.S. DISTRICT COURT FILED OCT 09 2015 S.D. OF N.Y.

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :
                                  :
     - v. -                       :
                                  :
BOUBAKAR SACKO,                   :
                                  :
          Defendant.              :
                                  :
                                  :
- - - - - - - - - - - - - - - - - x

DOC #_____

COMPLAINT

Violation of
18 U.S.C. § 371

COUNTY OF OFFENSE:
BRONX

SOUTHERN DISTRICT OF NEW YORK, ss.:

STEVEN THAU, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

COUNT ONE
(Conspiracy to Export and Transport Stolen Motor Vehicles)

1. From at least in or about May 2014 up to and including at least in or about November 2014, in the Southern District of New York and elsewhere, BOUBAKAR SACKO, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, the exportation of stolen motor vehicles, in violation of Title 18, United States Code, Section 553, and the transportation of stolen vehicles, in violation of Title 18, United States Code, Section 2312.

2. It was a part and an object of the conspiracy that BOUBAKAR SACKO, the defendant, together with others known and unknown, would and did willfully and knowingly export and attempt

-1-

to export motor vehicles, knowing the same to have been stolen, in violation of Title 18, United States Code, Section 553.

3. It was a second part and an object of the conspiracy that BOUBAKAR SACKO, the defendant, together with others known and unknown, would and did willfully and knowingly transport, in interstate and foreign commerce, motor vehicles, knowing the same to have been stolen, in violation of Title 18, United States Code, Section 2312.

Overt Act

4. In furtherance of the conspiracy, and to effect the illegal objects thereof, BOUBAKAR SACKO, the defendant, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a. On or about July 15, 2014, in the Bronx, New York, SACKO attended and oversaw the loading of stolen motor vehicles into shipping containers that were subsequently taken to a seaport for transportation to West Africa.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Detective with the New York City Police Department ("NYPD") assigned to a joint task force with the Department of Homeland Security ("DHS") (collectively, "Law Enforcement"). I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, conversations that I have had with other Law Enforcement agents and individuals, and my review of reports prepared by Law Enforcement. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents, and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6. Based on my training and experience, my involvement in this investigation, and my conversations with other Law Enforcement agents, I have become aware of a fraudulent scheme occurring in multiple cities within the United States that involves

renting luxury cars from companies and, instead of returning them, shipping them to destinations in West Africa while stating on the bill of lading, in substance and in part, that they are salvage motor vehicles, *i.e.*, cars that are damaged and are to be sold for their salvage value. The scheme generally works as follows, with some variation between different manifestations of the scheme:

    a.    Individuals working for the scheme (the "Renters") rent luxury cars from various national car rental companies, sometimes using false identification (the "Luxury Cars").

    b.    The Renters drive the Luxury Cars to a prearranged location where the cars can be stored temporarily (the "Layup Location").

    c.    Other members of the scheme (the "Drivers") pick up the Luxury Cars from the Layup Location and drive them to a second prearranged location (the "Loading Location") where they are loaded into shipping containers (the "Shipping Containers"). Sometimes a separate member of the scheme follows the Drivers to the Loading Location and oversees or participates in the loading of the Luxury Cars into the Shipping Containers. Each Shipping Container typically contains two or three Luxury Cars.

    d.    The Shipping Containers are hauled by truck to a seaport. They are placed on ships and sent to destinations in West Africa. The bill of lading for each Shipping Container typically represents, in substance and in part, that the container is carrying salvage motor vehicles; but in fact, the container is carrying high-end rental cars that have been stolen from rental car companies.

    7.    Beginning in or around April 2014, I and other Law Enforcement officers began conducting physical surveillance of a parking lot at or near 4029 Park Avenue in the Bronx (the "Parking Lot"). We also engaged in video surveillance of the Parking Lot.

    8.    Also beginning in or around April 2014, I and other Law Enforcement officers began speaking to an individual employed at the Parking Lot ("Witness-1").

    9.    Based on my involvement in this investigation, my participation in physical surveillance of the Parking Lot, my review of video surveillance of the Parking Lot, my discussions with other Law Enforcement officers, and my discussions with Witness-1, I have learned that with varying frequency between at least as early as April 2014 and at least as recently as November 2014, Luxury Cars arrived

at the Parking Lot and were loaded into Shipping Containers there. By observing the vehicle identification numbers ("VINs") and license plates of the vehicles loaded into the Shipping Containers at the Parking Lot, and comparing them with the VINs and license plates of rental vehicles reported stolen by various national rental car companies, Law Enforcement officers have been able to determine that substantially all of the Luxury Cars loaded into the Shipping Containers at the Parking Lot had been rented from, and never returned to, various national rental car companies.

10. Based on my involvement in this investigation, my discussions with other Law Enforcement officers, and my review of reports prepared by other Law Enforcement officers, I am aware that on at least approximately 12 occasions between in or about May 2014 and in or about November 2014, the Luxury Cars were accompanied to the Parking Lot by a gray 2003 Ford Explorer bearing VIN 1FMZU73K53UB23190 and Illinois license plate R698374 (the "Explorer"). On substantially all of these occasions, the Explorer arrived at the Parking Lot immediately before or immediately after the Luxury Cars.

11. Based on identification documents produced at a traffic stop of the Explorer on or about June 9, 2014, and based on physical and video surveillance, Law Enforcement officers have identified the driver of the Explorer as BOUBAKAR SACKO, the defendant.

12. Based on my involvement in this investigation, my discussions with other Law Enforcement officers, and physical and video surveillance conducted by Law Enforcement, I have learned that when BOUBAKAR SACKO, the defendant, arrived at the Parking Lot immediately following or preceding the Luxury Cars, he typically exited the Explorer and oversaw the loading of the Luxury Cars into the Shipping Containers. Among other things:

    a. SACKO physically entered the Shipping Containers before the Luxury Cars were loaded into them, and remained present when the Luxury Cars were loaded into the Shipping Containers.

    b. SACKO brought loading equipment out of the Explorer and toward the Shipping Containers. The loading equipment was then used to load objects into the Shipping Containers, including the Luxury Cars.

    c. SACKO brought mattresses out of the Explorer and

-4-

toward the Shipping Containers.  The mattresses were then loaded into the Shipping Containers.

    13.  Based on my review of video surveillance from a parking garage in the vicinity of 3480 Park Avenue in the Bronx (the "Parking Garage"), I have learned that several of the Luxury Cars that were loaded into the Shipping Containers at the Parking Lot under the oversight of BOUBAKAR SACKO, the defendant, were stored at the Parking Garage in the days preceding their being loaded into the Shipping Containers.  I have also learned that on one or more occasions in the days leading up to the Luxury Cars being loaded into the Shipping Containers, the Explorer was present at the Parking Garage.

    14.  Based on my training and experience, I am aware that every Shipping Container has a unique serial number.  Based on Law Enforcement's tracking of the serial numbers on the Shipping Containers at the Parking Lot, as well as on physical surveillance, I have learned that shortly after the Luxury Cars were loaded into the Shipping Containers, the Shipping Containers were hauled by truck to ports in New York and New Jersey.

    15.  Based on my review of paperwork filed with Customs and Border Patrol ("CBP"), I have learned that the Shipping Containers into which the Luxury Cars were loaded were typically scheduled to be loaded onto cargo ships destined for ports in West Africa.

    16.  Based on my training and experience, I am aware that shipping containers carrying cargo to be transported overseas typically require bills of lading that state the content of the containers.  Based on my review of paperwork maintained by CBP, I have learned that the bills of lading for the Shipping Containers stated, in substance and in part, that the containers were carrying salvage motor vehicles.

    17.  Based on my involvement in this investigation, I am aware that since at least November 2014, Law Enforcement has been working with a confidential informant ("CI-1") who is in the shipping business.  CI-1 is paid by Law Enforcement and has provided reliable information in this and other investigations.

    18.  Based on my participation in debriefing CI-1, I have learned that in or about March 2015, CI-1 spoke to BOUBAKAR SACKO, the defendant, in a recorded phone conversation.  During that conversation, SACKO told CI-1, in substance and in part, that he was

-5-

looking for "bad" cars. Based on my involvement in this investigation, I believe that the term "bad" referred to cars that were stolen. SACKO further stated to CI-1, in substance and in part, that SACKO used to get cars from a sheriff, but that the sheriff had retired. SACKO further stated to CI-1, in substance and in part, that SACKO had been in the business for 22 years, and that his cars were sometimes seized at the seaport but no one ever got arrested.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of BOUBAKAR SACKO, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

Steven Thau
Detective
New York City Police Department


Sworn to before me this
9th day of October, 2015

THE HONORABLE HENRY PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK